UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO.  15-81194-CV-MARRA/MATTHEWMAN

BEACHES MLS, INC., a Florida corporation,

      Plaintiff,

vs.

MIAMI ASSOCIATION OF REALTORS, INC.,
a Florida corporation, JUPITER-TEQUESTA-HOBE
SOUND ASSOCIATION OF REALTORS, INC.,
a Florida corporation, TERESA KING KINNEY,
WILLIAM "BILL" COLE, GINA LLOYD, JESUS
FERIA, DANIELLE Y. CLERMONT, DEBORAH
BOZA-VALLEDOR, JOANNE WERSTLEIN,
ANGELA CALABRIA and JAMARR LYNCH,

      Defendants.

_____/

## DEFENDANT'S MOTION TO DISMISS COMPLAINT AND/OR DISSOLVE TEMPORARY RESTRAINING ORDER AND OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT

Defendant, JUPITER TEQUESTA HOBE SOUND ASSOCIATION OF REALTORS
INC., and Jupiter Employees Joanne Werstlein, Angela Calabria and Jamarr Lynch, (collectively
"JUPITER"), pursuant to Fed. R. Civ. P. 65(b)(4),  moves to dismiss the Complaint and/or dissolve
the Temporary Restraining Order  obtained by Plaintiff, BEACHES MLS, INC. (BEACHES),
entered by this Court on August 24, 2015 (the "TRO").  In Plaintiff's *Ex Parte* Application for
Entry of Temporary Restraining Order, Preliminary Injunction and Memorandum of Law in
Support ("TRO Motion") as well as Plaintiff's Complaint for Violation of the Computer Fraud and
Abuse Act, Copyright Infringement, Circumvention and Theft of Trade Secrets ("Complaint"),

1

Plaintiff failed to provide the court with an accurate or complete description of the facts. This Motion will correct the record by providing a <u>complete</u> recitation of the facts and in doing so will make clear that the TRO should be dissolved and a preliminary injunction going forward is improper.

This Motion will show:

(1) MIAMI *never* had access to BEACHES MLS without authorization;

(2) MIAMI *never* had the ability to delete, destroy or in any material way, alter BEACHES listings; and

(3) MIAMI *never* contemplated a merger with JTHS to access Palm Beach County real estate listings illegally- on the contrary- MIAMI *explicitly* provided for the requirement that any MIAMI member seeking such access would be required to pay just as any member would.

(4) BEACHES MLS did not comply with National Association of Realtors policy regarding disputes with other Associations by failing to resolve their differences by Mediation prior to filing this lawsuit.

Accordingly Plaintiff cannot show a substantial likelihood of prevailing on the merits of its CFAA claim, nor can Plaintiff show any irreparable harm, and therefore the TRO should be dissolved and no further injunction ordered.

2

## I.     STATEMENT OF FACTS

### A.   The Proposed Merger

Miami Association of Realtors, Inc. was chartered by the National Association of Realtors in 1920 and has over 38,000 members. Jupiter Tequesta Hobe Sound Association of Realtors, Inc. was chartered by the National Association of Realtors in 1971 and has over 1,500.00.  Beginning in May of 2015, MIAMI and JTHS engaged in discussions regarding the potential merger of the two entities.  The merger was approved on August 14, 2015, with announcements that the merger would be completed within 20 days.  Contrary to Beaches supposition, the merger has been structured to provide that JTHS will retain its rights to access the JTHS & BEACHES MLS as it has, and to the extent that MIAMI members want the same, they will be required to pay for it just like everyone else.

### B.   The Anger in Response to the Proposed Merger

In the backdrop of this otherwise mundane merger, BEACHES was outspoken in its disdain for any MIAMI presence in its geography and the prospect of the merger with JTHS. Simply put, RAPB took the position that it was the sole owner of BEACHES MLS and did not want the two entities to merge.  That sentiment and desire is set out in BEACHES *own words* as represented in its press release encouraging JTHS members to consider merging with RAPB rather than MIAMI.  Though BEACHES was against the merger, the merger eventually went to a vote and passed.

BEACHES then advanced its aggressive and punitive position by filing its Motion for TRO and Complaint and in a final effort to stop  the pending merger, cut MIAMI off from a data

3

stream it had shared (and from which both RPB and MIAMI as well as JTHS) for over 5 years. BEACHES embarked on this effort with a singular goal in mind: to disrupt the merger between JTHS and MIAMI at any cost.

### C. MIAMI's Access to the MLS

As is clear from the Declarations by each of the individually named Defendants, MIAMI *never* endeavored to obtain access to the BEACHES MLS illicitly, never altered, never deleted and never modified any of the data on the JTHS & BEACHES MLS in anyway. A brief recitation of the facts surrounding MIAMI's alleged "access" to the JTHS & BEACHES MLS is instructive on this point. Subsequent to the vote ratifying the merger, MIAMI approached JTHS to figure out a way to identify the universe of JTHS members using the JTHS & BEACHES MLS. MIAMI did so because the merger would yield products that MIAMI would be able to offer JTHS members not previously available to them and both JTHS and MIAMI wanted to hit the ground running. To that end, JTHS as an administrator of its own JTHS MLS, authorized certain MIAMI members with the ability to search the JTHS & BEACHES MLS for JTHS members. The principle purpose of the search was to be able to have the population of JTHS members fully identified so that after the merger was effective, MIAMI could offer them products not previously available. Importantly, the JTHS & BEACHES MLS is not just comprised of BEACHES members but of JTHS members as well. Accordingly the authorization is both allowed and contemplated under the operative agreements controlling the parties. The access was ultimately only made use of by one individual associated with MIAMI to search for JTHS members. And the access that was provided was subject to strict confidentiality provisions agreed to by the parties as part of the due diligence process. To be absolutely clear:

4

(1) MIAMI obtained authorization to search BEACHES for JTHS members;

(2) that MIAMI employee (Bill Cole) as well as the remaining five who received access *never* received MLS-level access to delete or alter any of BEACHES listings;[1] and

(3) Only one MIAMI employee (Bill Cole) accessed the JTHS & BEACHES MLS and did so only to search for JTHS members. Bill Cole never altered, edited or deleted any BEACHES listings.

Thus, contrary to BEACHES' hyperbole contained in its TRO Motion that its "very existence" was "threatened[2]", BEACHES was fully aware of that was absolutely untrue.  Indeed on August 7, 2015, two weeks prior to BEACHES filing their Complaint and TRO Motion, BEACHES was the recipient of an email sent by an employee at Flex stating that it had "removed the ability for any login to access the MLS-level functions." At the time that BEACHES filed its TRO Motion and Complaint, it was fully aware that MIAMI was given <u>only access as to *JTHS* members and JTHS listings</u>, not to BEACHES members or its listings[3].  At bottom, Plaintiff withheld the following essential facts from the Court:

1.  JTHS provided authorized access to six MIAMI employees;

2.  Only one MIAMI individual who obtained lawful access ultimately used it, and the access was used only to search for JTHS members and their listings;

---

[1] That truth is also revealed in the Exhibits to Sarah Chenoweth's Declaration, wherein Plaintiff conveniently provides the Court with partial screenshots which Plaintiff claims shows MIAMI members insidious level of access- but deliberately cuts off perhaps the most pertinent portion of the screen shot- the section that indicates that no members had the ability to *delete* listings.

[2] Certainly if BEACHES was truly concerned, its executives or its counsel could have called JTHS and/or MIAMI to ask if something was amiss.  Similarly BEACHES could have emailed either or both parties.  Either would have allayed BEACHES concerns immediately, however, BEACHES chose instead to seek *Ex Parte* judicial intervention forcing tremendous burden and expense.

[3] This is yet another example of Plaintiff's flagrant disregard for candor to the Court.

5

3.  The very documents Plaintiff believes proves its case- the partial screenshots of user access- shows that no listings could be deleted or otherwise modified. BEACHS knew as much at the time it filed its TRO Motion and Complaint, because on August 7, 2015, they received an email from Flex stating as much.

These four facts leave no question that Plaintiff's TRO Motion based on MIAMI's "BEACHES MLS intrusion" was, and is, a work of fiction.[4]

## II.    MEMORANDUM OF LAW

### A.  Legal Standard for a Preliminary Injunction

The law with respect to the basis upon which to obtain a preliminary injunction is legion.   The burden is on the Plaintiff to establish (1) a substantial likelihood of success on the merits;   (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not serve the public interest. *See Palmer v. Braun,* 287 F.3d 1325, 1329 (11th Cir. 2002); *SunTrust Bank v. Houghton Mifflin Co.,* 268 F.3d 1257, 1265 (11th Cir. 2001); *AM. Red Cross v. Palm Beach Blood Bank, Inc.,* 143 F.3d 1407, 1410 (11th Cir. 1998); *McDonalds Corp., v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998).   Each element must be given its due consideration and each must be supported by competent evidence.  *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000) citing *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.,* 887 F.2d 1535, 1537 (11th Cir.1989). Indeed, the absence of irreparable harm, standing alone, renders injunctive relief improper.  *See Snook v. Trust Co. of Georgia Bank of Savannah, N.A.,* 909 F.2d 480, 486 (11th Cir.1990) (affirming denial of preliminary injunction even though plaintiff established likelihood of prevailing because plaintiff failed to meet burden of proving irreparable injury).   Importantly, irreparable injury is not proven through speculation, supposition, or rhetoric but requires a showing based on credible

---

[4] Worse, however, is that Plaintiff's TRO Motion appears to be a pretext for an attempt to derail the merger between JTHS and MIAMI.

evidence. *See Mercedes-Benz U.S., Inc. v Cobasys LLC,* 605 F.Supp.2d 1189, 1207 (N.D. Ala. 2009); *CBS Broadcasting, Inc. v. EchoStar Communications Corp.* 265 F.3d 1193, 1206 (11th Cir. 2001) ("We refuse to engage in speculation and conjecture in reviewing this nationwide preliminary injunction."). At bottom "a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000) citing *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.,* 887 F.2d 1535, 1537 (11th Cir.1989). In this case, Plaintiff cannot meet its burden.

## B. Plaintiff Cannot Show a Substantial Likelihood of Success on the Merits of its CFAA Claim

As the factual recitation makes clear, Defendants did not act in any way that would support Plaintiff's wild claims. However, in the interest of making that point as salient as possible, particularly in the context of the injunctive relief sought by Plaintiff, this section will address Plaintiff's Computer Fraud and Abuse Act Claim[5] ("CFAA") and in particular why Plaintiff did not show, and cannot show a substantial likelihood of success on the merits.

---

[5] Because Plaintiff sought redress in its TRO Motion based on CFAA, presented its "evidence" only as pertaining to the CFAA claim, and the Court entered its Order addressing the Motion based on CFAA, the instant motion focuses on Plaintiff's CFAA claim only.

[6] It should be noted that Plaintiff cannot even find salvation in the statute for the remedy it seeks, as, 18 U.S.C §§ 1030(g) does not even provide for non-economic damages.

18 U.S.C §§ 1030(g) provides that:

(g) Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in

Plaintiff's first claim pled against MIAMI is a violation of the Computer Fraud and Abuse Act pursuant to 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(4) and 1030 (a)(6)(A).[7]  It is important to note that this claim originates from a statute which was "designed to target hackers who access computers to steal information or disrupt or destroy computer functionality."  *See Trademotion LLC, v. Marketcliq, Inc.* 857 F.Supp 2d 1285, 1290 (M.D. Fla. 2012).  The statute maintains a private right of action (though it is primarily a criminal statute) to "any person who *suffers damage[8] or loss by reason of a violation of this section...*" 18 U.S.C. §1030(g) (emph. added).

1.   **Plaintiff's 18 USC § 1030(a)(2)(C) Claim**

For Plaintiff to show a substantial likelihood of success on the merits under its 18 USC § 1030(a)(2)(C) claim it must persuade the Court that its evidence will prove that MIAMI

---

subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i).  **Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages....**" *Id.* (emphasis added).

[7] Whoever—
    (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains—
        (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.
        (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;
        (6) knowingly and with intent to defraud traffics (as defined in section 1029) in any password or similar information through which a computer may be accessed without authorization, if—
        (A) such trafficking affects interstate or foreign commerce

[8]  Under the statute, the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information. 18 U.S.C. §1030(e)(8).

intentionally "accessed" a computer, (1) lacked authorization or exceeded its authorized access to that computer, (2) obtained information from the computer and (3) caused a loss of at least $5,000 to Plaintiff. *Clarity Services, Inc. v. Barney* 698 F.Supp.2d 1309, 1314 (Fla. M.D. 2010).  As a preliminary matter, Plaintiff must show both damage and loss in order to meet their burden – something that Plaintiff has not and cannot do. *See Lyons v. Coxcom, Inc.*, No. 08-CV-02047-H(CAB), 2009 WL 347285, at *7 (S.D.Cal. Feb.6,2009); *Kalow & Springnut, LLP v. Commence Corp.*, No. 07-3442(FLW), 2009 WL 44748, at *2 (D.N.J. Jan 6, 2009).

Here there is no dispute by any party that MIAMI "accessed" a computer, however as to each of the remaining three necessary elements, Plaintiff has not an iota of support, let alone enough to show a substantial likelihood of prevailing on the merits of this claim.

*First,* MIAMI had authorization to access the JTHS & BEACHES MLS.  That authorization was provided by JTHS and was intended for one purpose and one purpose only, to facilitate identifying the universe of JTHS members within the database as part of the due diligence associated with planned merger between the parties as well as post-merger logistical execution. Moreover, the access that MIAMI was provided did not exceed the authorization it was given by JTHS, as, only one individual of the six who were granted access actually made use of it, and his use of the access was to search for and identify JTHS members, nothing more.  Accordingly there is no basis upon which to conclude that Plaintiff can make a showing under prong two of 18 USC § 1030(a)(2)(C).

*Second,* Plaintiff has provided this Court with no evidence that MIAMI "obtained information from the computer."  Indeed, this brings us to Plaintiff's "shoot first and ask questions later" strategy, because, if Plaintiff had any evidence that MIAMI had obtained information proprietary

to BEACHES, it certainly would have brought that to the Court. Put simply, the law does not permit Plaintiff to guess, argue or speculate its way into an injunction. *See Wooden v. Board of Regents of University System of Georgia,* 247 F.3d 1262, 1284 (11th Cir. 2001)("[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges ... a real and immediate-as opposed to a merely conjectural or hypothetical-threat of future injury."). In this case, not only has Plaintiff failed to show any actual evidence to meet its burden, but the evidence before this Court explains that MIAMI obtained nothing from BEACHES. *See* B. Cole Dec. at INSERT   Accordingly there is no basis upon which to conclude that Plaintiff can make a showing under prong three of 18 USC § 1030(a)(2)(C).

*Third,* Plaintiff has provided this Court with no evidence that MIAMI "caused a loss of at least $5,000 to Plaintiff" and the evidence before the Court conclusively shows that Plaintiff has failed to do so because Plaintiff has sustained no loss whatsoever. This is of tremendous gravity, because as a threshold matter, in each and every instance under Plaintiff's 18 U.S.C. § 1030(g) claims it is *required* to bring forward evidence of damage or loss in order to even properly plead a colorable claim, and Plaintiff fails to do so each and every time. Indeed, the only way that Plaintiff endeavors to meet this burden is by trying to scare the Court into believing the loss is inevitable based on MIAMI's "ability" to delete, change and alter BEACHES data. *See* Chenoweth Dec. at Pg. 4. Plaintiff's effort is misguided, misleading and offensive, because even prior to the time of Plaintiff's filing, it had received notice from Flex that JTHS and BEACHES would no longer have MLS level access, and, the actual screen shots attached by Plaintiff as "proof" of the violations it claims occurred, demonstrate the same. Each screen shot specific to each user reveals that the extent to which they had access to "modify" was only as to JTHS members, and none had the ability to delete any listings. At bottom, Plaintiff fails to make a

10

showing under prong four of 18 USC §1030(a)(2)(C).  Having therefore failed to even present an ounce of credible evidence as to three of prongs under 18 USC §1030(a)(2)(C), and, on the contrary, having now shown that in every instance evidence exists impeaching Plaintiff's claims, there can be no question that Plaintiff is unable show a substantial likelihood of success on the merits under its 18 USC §1030(a)(2)(C).

### 2.  As to 18 U.S.C. 1030(a)(4) and 1030 (a)(6)(A)

For Plaintiff to show a substantial likelihood of prevailing on the merits of a claim brought under 18 U.S.C. §1030(a)(4), Plaintiff must persuade the Court that it has evidence to show that MIAMI (1) knowingly and with intend to defraud, (2) accessed a protected computer without authorization (3) obtained anything of value and (4) caused a loss and damages aggregating at least $5,000.  *TracFone Wireless, Inc. v. Cabrera*, 883 F.Supp.2d 1220, 1228 (11th Cir. 2012). In order for Plaintiff to meet their minimum showing (as opposed to show a substantial likelihood of prevailing on the merits), Plaintiff would have to demonstrate more than just an authorized browsing of information.  *See U.S. v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997).  Additionally Plaintiff must prove that it suffered damage or loss in more than just a conclusory fashion.  *See Andritz Inc. v. Southern Maintenance Contractor, LLC* 626 F.Supp.2d 1264, 1266-67 (M.D. GA. 2009).  It cannot be overstated that Plaintiff has brought absolutely no evidence of any kind that MIAMI knowingly and with intent to defraud did *anything* relevant to any of Plaintiff's claims including this one.  Moreover, the affidavits of all Defendants articulate that no fraudulent or otherwise illicit intent was involved in the request for access to JTHS & BEACHES MLS.  In that same vein, no evidence was presented by BEACHES that anything of value was obtained by MIAMI and that any access to MIAMI caused a loss or damages to BEACHES whatsoever.  At

11

bottom, Plaintiff's claim under 18 U.S.C. §1030(a)(4) is wholly unsupported by evidence, and therefore Plaintiff is unable to show a substantial likelihood of prevailing on the merits of the claim.

Plaintiff's 18 U.S.C. §1030 (a)(6)(A) claim similarly fails.  Plaintiff has provided not a shred of evidence to show that it will prevail on the elements that MIAMI (1) knowingly and with intend to defraud, (2) trafficked in any password or similar information (3) through which a computer may accessed without authorization if (4) such trafficking affects interstate or foreign commerce. Other than conclusory assertions, Plaintiff brings this Court no evidence in support of its claims. Plaintiff instead speculates and tries to stir fear.  Accordingly, Plaintiff's lack of showing with respect to the individual elements of 18 U.S.C. §1030 (a)(6)(A) gut Plaintiff's attempt to show a substantial likelihood of prevailing on the merits of a claim premised on the same.

The net of an element by element analysis of any claim brought by Plaintiff under 18 U.S.C. §1030 is the same:  Plaintiff fails.  Plaintiff fails because MIAMI had authorized access to the Flex JTHS & BEACHES MLS, Plaintiff fails because MIAMI never had the ability (or desire) to alter, delete or otherwise threaten BEACHES "data," Plaintiff fails because MIAMI never caused loss or damage to BEACHES and no evidence therefore exists to that end, and BEACHES fails because MIAMI never took any action with any knowing intent to defraud BEACHES.  For those reasons and more, Plaintiff cannot show a substantial likelihood of prevailing on that claim.

## C.  There is No Threatened Injury to Plaintiff

In addition to the requirement that Plaintiff show a substantial of likelihood of prevailing on the merits of its CFAA claims (which it cannot do), Plaintiff must also show that absent the issuing

of an injunction, it will suffer irreparable harm. *See McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998) (citing *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.,* 887 F.2d 1535, 1537 (11th Cir.1989)).  The requirement of that showing reminds the Court that the grant of a preliminary injunction is an "extraordinary and drastic remedy" and that to grant the same "it is the exception rather than the rule." *U.S. v. Lambert*, 695 F.2d 356, 539 (11th Cir.1983).  Irreparable injury is not measured just based on harm in a given moment, instead Plaintiff must demonstrate the threat of continuing irreparable harm. *Sigel v. LePore,* 234 F.3d 1163, 1177 (11th Cir. 2000).  Speculation as to the possibility of some future injury cannot stand in place of actual credible evidence of the same. *See Church v. City of Huntsville,* 30 F.3d 1332, 1337 (11th Cir.1994) ("a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical— threat of future injury").

In this case there is no irreparable injury to Plaintiff in the absence of an injunction for three reasons. *First,* MIAMI does not have the ability to alter or otherwise to delete BEACHES data. *Second,* MIAMI never had the desire to and therefore never sought the ability to alter or otherwise to delete BEACHES data.  Therefore, *third,* Plaintiff has never lost any control over BEACHES data and will not in the foreseeable future.  Given those key facts and the incontrovertible evidence that supports each, Plaintiff simply cannot bring forward any credible argument that absent an injunction it will suffer irreparable harm.

**D. As there is No the Harm to Plaintiff,  Plaintiff Cannot Show that the Threatened Injury to Plaintiff  Outweighs the Potential Harm to Defendants, and any Preliminary Injunction Would Disserve Public Interest *Per Se***

Given that Plaintiff cannot point to any injury or harm that was suffered, or will be suffered, it follows that the issuance of any form of an injunction will only serve to harm Defendants in furtherance of Plaintiff's agenda to derail or at minimum frustrate their merger.   For that same reason, the issuance of a preliminary injunction would therefore disserve public interest per se. Accordingly, Plaintiff fails to meet their required showing with respond to each of these elements.

### E.  BEACHES MLS has failed to comply with National Association of Realtors policy by failing to request Mediation of the dispute prior to filing the instant lawsuit.

BEACHES MLS is a wholly owned subsidiary of Realtors Association of the Palm Beaches Inc., which operates under a charter from the National Association of Realtors.

Similarly, each of the defendant corporations, MIAMI and JUPITER, are chartered by the National Association of Realtors.

One of the requirements of each Association charter is a duty to abide by the By Laws and Rules and Regulations and Policies of the National Association of Realtors.

One of the policy issues mandated by the National Association of Realtors, as set forth in Exhibit 1 attached hereto, which relates to a requirement to attempt to resolve differences through mediation prior to filing a lawsuit.

The violation of this policy can result in sanctions so severe as to cause a loss of an Association's charter and a re-assignment of the association territory.

A confirmation that this policy is in effect is confirmed through correspondence from General Counsel to the undersigned dated August 28, 2015 and attached hereto as Exhibit 2.

14

There has been no allegation stated in Plaintiff's Complaint that there was a request to the defendant corporations to engage in mediation on the issues complained of herein.

Absent a showing that a mediation was attempted or requested and refused, this condition precedent must be satisfied.

## CONCLUSION

The complaint should be dismissed based upon failure to attempt mediation prior to filing this lawsuit and the BEACHES TRO must be dissolved. In the alternative, BEACHES has failed to establish any element entitling it to relief- Miami did not delete, alter, modify, distribute, sell or otherwise do anything that violate CFAA. There is no basis for the court to enter a TRO against any of the defendants or to allow this suit to continue.

Respectfully submitted,

LAW OFFICE OF GARY J. NAGLE
14255 U. S. Hwy 1, Suite 203
Juno Beach, FL 33408
561) 626-0270 Phone
(561) 626-1244 Fax
Gary@naglelawfl.com
***Attorneys for Defendants***

BY: _____
GARY J. NAGLE
FL BAR NO. 239410

15

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this ___Sept 3 2015___ a true and correct copy of the

foregoing was filed with the Clerk of Court using CM/ECF thereby serving all parties and counsel

of record on the attached Service List by electronic notification generated by CM/ECF.

_____
GARY J. NAGLE

16

<u>**SERVICE LIST**</u>

*Attorneys for Plaintiffs:*

Joel B. Rothman,
Jerold I. Schneider
Diana F. Mederos
SCHNEIDER, ROTHMAN
INTELLECTUAL
PROPERTY LAW GROUP, PLLC
4651 North Federal Highway
Boca Raton, Florida 33431
Tel:  561-404-4350
Fax:  561-404-4353
E-mail: Joel.Rothman@sriplaw.com
E-mail: Jerold.Schneider@sriplaw.com
E-mail: Diana.Mederos@sriplaw.com

*Attorney for Defendants:*

Steven W. Davis
Boies, Schiller & Flexner LLP
100 Southeast Second Street, Ste 2800
Miami, FL 33131
Tel: 305-539-8400
E-mail: sdavis@bsfllp.com

17

## NAR Association Policy Violation Resolution Procedure

### Overview

- Article I, Section 2 (a) of NAR's Bylaws (NAR Bylaws) prohibits state and local associations and their MLSs from adopting any rule, regulation, practice or policy inconsistent with, or contrary to, any policy adopted by the NAR Board of Directors.

- Article I, Section 2 (b) of NAR's Bylaws requires state and local associations and their MLSs to be honest and truthful in their communications; to present a true picture in their advertising, marketing, and other representations; to avoid false, deceptive, or misleading advertising and marketing practices; and to refrain from knowingly or recklessly making false or misleading statements about other associations' programs, products or services.

- Article III, Section 6 of the NAR Constitution (NAR Constitution) provides that "All Member Boards must comply with the Organizational Standards for Local Boards and Associations established by the Board of Directors. Any Member Board that fails to satisfy the Organizational Standards may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association. Each State Association shall enforce the Organizational Standards for Local Boards and Associations within the state. Any State Association which fails to enforce the Organizational Standards may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

- Other mandatory policies adopted by the NAR Board of Directors are found in the NAR Constitution, Bylaws, Code of Ethics and Arbitration Manual, Handbook on Multiple Listing Policy, and in other NAR documents. Other NAR mandatory policies require adoption/implementation in local and state association governance and administrative documents including bylaws, MLS rules and regulations, and professional standards enforcement procedures. Enforcement of the Quadrennial Ethics Training and dues formula requirements are mandatory, regardless of whether they are included in an association's governing documents.

- Most instances of association noncompliance are commonly identified and remedied in the course of NAR's review of local and state association governing documents. Issues of noncompliance may also be brought to the attention of NAR by other associations and NAR may undertake efforts to identify and correct any noncompliance. Associations may also bring complaints against other associations alleging failure or refusal to comply with an NAR-mandated policy. Such complaints must be filed in writing, must include specific detail describing the alleged area of noncompliance, and must include certification that the complaint is being filed at the direction of the association's board of directors.

- Associations that have differences with other associations that do not involve an alleged violation of NAR policy must attempt to resolve their differences with one another through mediation before filing a lawsuit.

1

10797617.1

10924179.1

Exhibit 1

## Policy Violation Resolution Procedure

The following procedure will be followed when an association brings a complaint that another state or local association has failed or refused to comply with or has otherwise violated any NAR-mandated policy, other than the Organizational Standards for Local Boards and Associations, including without limitation the duty imposed by  Article I, Section 2 of the Bylaws to "avoid false, deceptive, or misleading advertising and marketing practices and shall not knowingly or recklessly make false or misleading statements about other Member Boards,  or Member Boards' programs, products or services."  This procedure, beginning with paragraph 3 below, will also be followed where NAR has identified noncompliance by an association but has been unable to resolve the matter and achieve compliance.

1. Complaints or allegations that a state or local association has failed or refused to comply with or has otherwise violated any NAR-mandated policy ("violation") shall be directed, in the first instance, to the NAR Vice President of Board Policy and Programs.  If the complaint involves failure to pay dues or any other dues policy violation, the complaint shall be directed to the NAR Finance Committee and will be subject to the NAR Dues Collection Policy (attach/link).

2. The Vice President of Board Policy and Programs will review the complaint and consult with the NAR General Counsel and NAR Chief Executive Officer. If they determine that no violation appears to have occurred, they will inform the alleged violator and complainant in writing within 30 days of receiving the complaint.  The associations involved will also be directed to a listing of available mediators that they may choose to contact to help them resolve their differences. The associations will be reminded that they must attempt to resolve their differences with one another through mediation before filing a lawsuit.  The appropriate state association(s) will also be informed at this time of the complaint and of NAR's determination that a violation did not occur.

3. If, in the opinion of the Vice President of Board Policy and Programs, the General Counsel and the Chief Executive Officer, there appears reason to believe that a violation has occurred or is occurring, those staff will exercise reasonable efforts to cause the association to stop or correct the violation.  If it becomes clear to such staff that any continuing efforts are unlikely to succeed in convincing the association to stop or correct the violation, that conclusion, together with the relevant supporting documentation, will be provided to the NAR President.

4. The NAR President, through NAR AE and Leadership Development Department staff, shall invite the alleged violator association to meet with a panel of 3-5 members of the NAR Executive Committee appointed by the President, to review the facts underlying the alleged violation and any reason(s) offered by the association that it has not committed a violation. The panel shall meet at the next NAR meeting where the Executive Committee is scheduled to meet (during the May Midyear Meetings in DC, or the November REALTORS® Conference and Expo).  The alleged violator association and the complainant association, and the

2

appropriate state association(s), will be informed of the scheduled hearing and will be apprised of all subsequent proceedings and decisions.

5.  If the Executive Committee panel concludes that it is likely that a violation has occurred or is occurring, the panel will specify required remedial action and the association will be given a specified time period in which to complete remedial action.

6.  If after expiration of the specified time for compliance the association continues to refuse to remedy the violation, a "show cause" hearing will be scheduled and conducted before a panel of at least 7 and not more than 9 members of the Executive Committee (none of whom may have served on the initial panel) appointed by the President.   The state association will be notified of the hearing, be provided with all copies of all relevant documentation, and permitted, at its discretion, to offer its input, including its recommendation for consideration by the hearing panel.  All members of the violating association will be notified within 60 to 90 days prior to the show cause hearing that if the association is found to be in violation of an NAR-mandated policy, the association risks losing its charter. The show cause hearing shall take place at the next NAR meeting where the Executive Committee is scheduled to meet, prior to the full Executive Committee meeting (during the May Midyear Meetings in DC, or the November REALTORS® Conference and Expo).

7.  If the show cause hearing panel concludes that the association has committed and/or is committing a violation, the panel will recommend a sanction to be imposed on the association, within the scope of the sanctions provided herein.  That recommendation will be reported to the full Executive Committee for action.  The Executive Committee, acting on behalf of the Board of Directors, will impose a sanction, which may be that recommended by the panel or may be modified as determined by the Executive Committee.  Final results of the Executive Committee's decision will be communicated to the complainant association and the association committing the violation.

## Discipline/Sanctions

- Letter of reprimand sent to the violating association staff and volunteer leaders

- Association name and association's staff and volunteer leadership names, along with the nature of the violation or the NAR policy violated, to be published in *REALTOR® Magazine*, *REALTOR® AE Magazine*, on REALTOR.org, and in the Board of Directors minutes

- Fines issued in the amount recommended by the show cause hearing panel and approved by the Executive Committee; fines shall be assessed in an amount sufficient to deter subsequent violations, taking into account the size of the association, but may in no event be more than $100,000

- Probation with remedial steps that may include education or information designed to better inform the association about the policy violated and how to avoid subsequent violations

3

- Loss of association's charter; association's territory reverts to unassigned territory

Cs/Dispute Resolution/ Policy Violation Resolution Procedure 4-9-10

4

10797617.1

10924179.1



**NATIONAL ASSOCIATION of REALTORS®**

**Katherine Johnson**
**Senior Vice President & General Counsel**

430 North Michigan Avenue
Chicago, IL 60611
Phone: (312) 329-8372
Fax: (312) 329-8256

August 28, 2015

*Via Email*

Gary J. Nagle, Esq.
14255 US Highway One, Ste 203
Juno Beach, FL 33408
Gary@naglelawfl.com

Dear Gary,

I write in response to your question regarding litigation between REALTOR® associations. In May 2010, the National Association of REALTORS® (NAR) Board of Directors adopted the Association Policy Violation Resolution Procedure which states, in relevant part:

> "Associations that have differences with other associations that do not involve an alleged violation of NAR policy must attempt to resolve their differences with one another through mediation before filing a lawsuit."

That policy remains in full force and effect.

Sincerely,

K. Johnson

Katie Johnson
Senior Vice President and General Counsel
National Association of REALTORS®

REALTOR® is a registered collective membership mark which may be used only by real estate professionals who are members of the NATIONAL ASSOCIATION OF REALTORS® and subscribe to its strict Code of Ethics.

Exhibit 2